## GIBBONS v. THE STATE.

1. Sufficient foundation was laid for the admission, as a dying declaration, of the decedent's statement that the accused "shot her because she asked him for a match."
2. Statements made by the accused after the commission of the act upon which the indictment was founded, and which were not in the nature of res gestæ, were inadmissible in evidence.
3. The court did not err in refusing to permit a witness for the defendant to testify that "immediately after the shooting took place the defendant went to the husband of the deceased and called him down to the scene of the shooting."
4. There was nothing in the evidence to authorize a charge as to the law of involuntary manslaughter.

MARCH 13, 1912.

Indictment for murder. Before Judge Rawlings. Jefferson superior court. December 30, 1911.

Charles Gibbons was tried for the offense of murder, it being

charged in the indictment that he shot and killed Jane Long with a pistol. The jury returned a verdict of guilty, without a recommendation. He made a motion for a new trial, which was overruled.

On the trial Jim Powell testified as follows: "I know Charles Gibbons; there he is. . . I knew Jane Long, she is dead. I can't tell the date or the month of her death. I don't know exactly what time, but she died on Sunday evening after she was shot. I don't know the month, but it was in this year, 1911. I wasn't there when she died. I saw her when the shooting occurred. I was there when it happened, but I wasn't at her home when she died. She didn't lie down and die right away. The shooting was done late in the night, and she lived from that time until Saturday evening following. Charles Gibbons shot her. I saw the shooting. I was there sitting right side of her when she was shot; and she fell across my lap and said, ' Oh Lord, Jim, I am shot.' She said that Charlie Gibbons right at the time. At the time of the shooting Jane Long was sitting down. She had my pipe and tobacco in her hand at the time, but nothing else as I know of. She was doing nothing to Charles Gibbons when he shot her as I know of. She hadn't done anything to him at all as I know of. It was dark. I don't know what she was doing, but she wasn't doing anything as I know of, and if she was doing anything I could have seen it. It would be according to what she was doing. I was looking at her, and she had my pipe and tobacco, but she didn't have anything else in her hand. She wasn't saying anything to Charles at the time he shot her, as I know of; only asked him for a match. He didn't give it to her. He told her he didn't have a match but he would light her pipe. I didn't hear him say what he would light it with, but he said he would light her pipe, and she was shot shortly afterwards. It wasn't as much as a minute afterwards before he shot her. I seen his pistol. I would know his pistol if I were to see it again. This is his pistol [identifying pistol shown]. That is the same gun that he shot the woman with. He was right close to her when he shot her, not a step apart hardly."

Another eye-witness was Bob McBride, who testified, in part, as follows: "I know Jane Long. I was present the night she was killed. I saw her when she got shot. Charlie Gibbons shot her with a pistol. . . I was standing about as far from him when the shooting took place as from here to that gentleman there, I

guess [indicating the stenographer]. She wasn't doing anything to Charles when he shot her. As to what Charles was doing at the time he shot her, he got up and walked off and went around and shot her. He got up off the steps. I couldn't tell who all there was sitting on the steps, but the steps was full of people. I don't know who all was there. Charles was the only man that got up and walked off up there in front of her. As to what she said to Charles to make him shoot her, she asked Jim, she says ' Jim Powell,' she says, 'Jim, I want to smoke. Give me some tobacco and your pipe.' Jim says, ' I have got tobacco and pipe, but I haven't got any match,' and she says ' Charlie, give me a match,' and Charlie got right up off of the steps, walked off, and he walked by me, and as he come by me he says, ' All right, I will give you a light,' and he give himself a quick turn that way, and the pistol fired, and she hollered and says, ' Jim, Charlie has shot me, Charlie has shot me.' Charlie then didn't say nothing. Charlie hadn't then said nothing still. . . He was sitting on the steps below Jim Powell and Jane, on the second step from the ground, and Jim sitting on the second step from him. Jane asked this man, Charlie Gibbons, for a match. He didn't say that he didn't have any match. He just got right up and walked around, and says, ' I will give you a light, and then he whirled; he had his hand already along here, and when he says, ' I will give you a light,' he whirled and shot her. He didn't pull his pistol out and stick it at her. I will show you how he done it [indicating]. The pistol didn't fire until he turned around. He didn't take his pistol out at all. I was looking at the barrel of the pistol in his hand. The woman said, ' Oh, Jim, Charlie has shot me.' Charlie didn't say right away, ' I didn't shoot you.' He waited a while, and after a while he said, ' You say I for shoot you?' And he said, ' I didn't for shoot you.' He says, ' Jim shot you.' I said I looked at the place where this woman was shot after she was shot. It struck her right along here [indicating right side], and came out right along here. She was hit on the right side, and it came out back here, on the left-hand side. That is the way it went. She was shot in front [indicating]. Right after the shooting this man Gibbons turned around and said ' If I knew who shot that woman I would shoot him.' "

George Long, the husband of the decedent, testified in part as follows: "She was not hoping all the time she would get well. She

did not say so. She said she was going to die all the time. That is what she told everybody that came in there. That she knowed she could not live, the way she was shot. She said that she was going to die. She was bright and conscious all the time, and talking as good as I am; only she was in pain. She told me that Charlie shot her because she asked him for a match. That is what she said in her statement to me. I saw where the bullets went in." On cross-examination of the witnesses referred to, there were some variations in the statements of the facts testified to on the direct examination, but in substance the testimony given on direct examination was unchanged. Several witnesses were introduced for the defense, who testified positively that they were where they could see the defendant at the time of the shooting; that he did not have a pistol; that he did not shoot; that the decedent, immediately after exclaiming that she was shot, said that she did not know who shot her; and that she never stated that the defendant shot her until some other person had said that the defendant shot her. It was shown that immediately before the shooting took place the accused performed several acts of considerate kindness for the decedent, evincing friendly and kindly feelings towards her. The defendant made a statement in which he denied the shooting, narrated at length the events at a house at which there was an entertainment given on the evening on which the decedent was shot, and stated at length various acts upon his part showing his friendly feeling towards the decedent just before she was shot. Witnesses for the defendant also testified that the shot came from a direction immediately in her front, and that the accused was standing at her side and not in the direction whence the shot came.

*R. N. Hardeman,* for plaintiff in error.

*T. S. Felder, attorney-general, Alfred Herrington, solicitor-general,* and *Hines & Jordan,* contra.

Beck, J. (After stating the foregoing facts.)

1. Sufficient foundation was laid for the admission, as a dying declaration, of the decedent's statement that the accused "shot her because she asked him for a match." "A prima facie case is all that is necessary to carry dying declarations to a jury. When this has been made out, the declarations are admitted, and the ultimate determination as to whether or not the person making them was in

articulo mortis and realized that death was impending is for the jury." *Findley* v. *State,* 125 *Ga.* 579 (54 S. E. 106).

2. The second ground of the motion for a new trial is as follows: "Because the following material evidence offered by the movant was illegally withheld from the jury against the demand of the movant, to wit: Movant offered to prove by the witness Sarah Henkins that the defendant found the deceased at the frolic house just previous to the fatal shot, in a drunken condition; that he got her a chair, took her to the window, took care of her, and took her down to the house where the shooting occurred, in a drunken condition. When this testimony was offered, the court was then and there informed as to what the witness would testify; and the court ruled as follows on the admission of this evidence: ' I will sustain the objection only as to what the defendant told this witness after the shooting.' " The real meaning of the complaint against the court's ruling is somewhat obscure, because, in the evidence set forth in this particular ground of the motion, there is no reference to anything that was said by the defendant after the shooting, and yet the court's ruling is that objection to the testimony was sustained "only as to what the defendant told this witness after the shooting." We might dismiss this ground without further consideration, and with the mere statement that it appears that all of the evidence offered was admitted. And this appears to be the fact, after examination of the brief of the evidence. But we take it, that, in connection with the testimony set forth in the motion, the defense offered to prove certain sayings of the defendant, made to the witness after the shooting, and that the evidence in regard to the sayings of the defendant was excluded. Clearly the court was right in excluding anything that might have been said by the defendant after the act, it not being contended that these sayings were in the nature of res gestæ.

3. The court did not err in refusing to permit a witness for the defendant to testify that "immediately after the shooting took place the defendant went to the husband of the deceased and called him down to the scene of the shooting." *Lingerfelt* v. *State,* 125 *Ga.* 4 (53 S. E. 803).

4. Under the evidence the jury could only have found either that the defendant did not fire the fatal shot or that the killing was unprovoked murder. The plaintiff in error insists that he was

entitled to a charge upon the subject of involuntary manslaughter, and complains that the court nowhere in his instructions to the jury gave the law of involuntary manslaughter in charge. There was no evidence authorizing such a charge. There was no suggestion that the shooting was unintentional in the commission of an unlawful act, or of a lawful act without due caution and circumspection; and the court very properly refused to give instructions to the jury which would have authorized them to indulge in pure conjecture.          *Judgment affirmed. All the Justices concur.*