STATE, Respondent, v. STALEY, Appellant.

·(223 N. W. 943.)

(File No. 6596.   Opinion filed March 12, 1929.)

*Louis H. Smith* and *Danforth & Barron,* all of Sioux Falls, for Appellant.

*Buell F. Jones,* Attorney General, and *Bernard A. Brown,* Assistant Attorney General, for the State.

BURCH, J.   Shortly after 2 o'clock on June 29, 1926, defendant shot and killed Thomas Wasson. He was thereafter tried for murder, convicted and sentenced to life imprisonment in the state penitentiary. He appeals from the judgment and an order denying a new trial.

The first question presented by the assignments of error pertains to the admissibility of evidence of the conduct of appellant following the shooting. For a proper understanding of the relevancy of such evidence, it will be necessary to first state the facts and circumstances leading up to and surrounding the homicide, and thereafter the evidence upon which the assignments are based.

Deceased and appellant were both farmers, living a few miles from Moenville, a post office situated in Haakon county. The tragedy occurred near a wire fence, placed on the section line between a school section, section 16, and the section lying immediately west, section 17. There were three wires composing the fence, which was set on the section line. The section line highway, 66 feet in width, was bisected thereby so as to throw approximately 33 feet of the highway on each side of the fence. Deceased lived near the southeast corner of the northeast quarter of section 17. Appellant lived a mile east and a little north, near the northeast corner of section 16, the school section. A short distance north of Wasson's buildings there was a wire fence extending east and west, connecting with the section line fence by a gate. On the north of the quarter there was also a wire fence connecting with the section line fence without a gate. For some time (probably before the last-named fences were built though the record is silent as to this) there had been a wagon trail running along the west side of the section line fence, but for about 2½ years that had been abandoned, and the trail thereafter ran along the east side of the fence. Short-

ly after noon on the day of the homicide, appellant left his home on horseback with his 12 year old son, both riding the same horse. Appellant took a pistol with him, which he explains was taken to kill a rabbit for his wife, who was then ill. In time he came to the gate near the home of deceased, and, instead of turning to the east of the fence and following the road on the east side, he went through the gate and followed the old trail on the west side of the section line fence. Deceased was not at home at the time, but had gone to a 40-acre tract north of the school section and on his return from the tract was coming across the school section in a southwesterly direction. Deceased and his wife were together and had a load of brush on a wagon drawn by horses. As they were coming across the school section they noticed a man and boy on horseback on the west side of the fence. Thinking they were strangers, unfamiliar with the road, the Wassons turned their team towards the west, drove to the trail along the west side of the section line fence, and proceeded down that road until they came opposite appellant and his son. What then happened is in dispute. Mrs. Wasson says: As she and her husband came near, they recognized appellant, and when they were opposite they stopped the team, and she spoke to appellant and said: "George, you're on the wrong side of the fence, how did you get through there?" Appellant replied: "I came through the gate up there." To which she answered: "That is all right, George, only you will have to go back the way you came as there is no gate at the north end." That deceased got out and went behind the wagon, where he stood holding onto the brush, when she turned, and saw appellant put his hand to his hip pocket. Her husband (deceased) spoke to appellant saying: "George, you can't get through over north, or how are you going to get through?" To which appellant replied: "You come on, and I will show you how I will get through." She says her husband was standing back of the wagon when appellant fired the first shot; that she saw appellant pull out his gun, saw his hand shake when he fired, and the bullet went south and east toward the horses, which caused the horses to jump and plunge toward the east. Shortly thereafter, about a second according to the wife, she heard a second shot, followed in quick succession by a third. During this time she was busy controlling the team, but shortly thereafter her husband came around the wagon, climbed up beside her,

and said: "Now, Belle, let them go as hard as they can; he shot me in the back and I am a dead man;" after which they hurried home.

Appellant's version is that Mrs. Wasson said that appellant could not go through that way, to which he replied: "I didn't know you had changed the road to the other side of the fence." Quoting from appellant's brief, appellant's testimony is as follows: "Wasson then said I wasn't going back that way and he jumped out of the wagon and came around the wagon. I believed Wasson had a gun, and the boy got off the horse and then I did. I could see after the boy was off the horse that Wasson had a knife in his hand, so I fired the revolver to one side. I thought this would stop him but he then came on very fast right up to the fence. He stooped down to come through the fence and I fire again. He said, 'Damn you, you're not going that way,' and then I fired the shot at him. When I fired the last shot he had the knife in his right hand. We were so close together that I had to step back or he would have reached me. I believed my life was in danger when he came at me with the knife in his hand. I fired the first two shots to my right toward the team. After the third shot Wasson went back and got into the wagon. I walked on up the fence."

Deceased was hit in the back, the ball entering his body low down, a little to the right of the backbone, passing slightly upward through his body, coming out between the seventh and eighth ribs, a little to the left of the middle of his body, and lodging in his clothing, where it was found. After getting home, deceased was left alone while the wife went to summon help. During the night an attempt was made to move deceased to the hospital at Pierre, but on the road a few miles out he died in the early morning of the day following the shooting. Appellant claims that he shot in self-defense.

The evidence assigned as erroneously admitted pertains to the conduct of appellant following the shooting. It is objected to on the grounds that it does not relate to the offense charged, but to an entirely different offense. It is substantially as follows: There are three occurrences. First, an hour or more after the tragedy appellant went to the home of Leonard Grotta and there had a conversation in reference to a line fence between his land and Grotta's. During the conversation appellant insisted that Grotta would have

to sell him a half interest in the fence or have trouble. Grotta testified that at that time appellant appeared to be very angry and nervous, otherwise not much different than usual. Second, about 6 o'clock, being three or four hours after the tragedy, appellant went to the home of Olie Grotta to get a plow belonging to Joe Hayes. He met Grotta in the field, and while conversing with Grotta, he, without any apparent cause shown by the record, became angry, used bad language, shook his fist in Grotta's face, and drew a gun from his pocket. Grotta said he did not want to fight, and suggested they go to the house and settle the matter. The two started to the house, but after going a short distance appellant said, "Let's us drop it," and said he was sorry he put his hand in his pocket. Third, about 7.30 o'clock of the same day Joe Hayes went to appellant's home to get a drag. After getting the drag, he met appellant in the yard, and appellant demanded that Hayes settle for a steer that he claimed Hayes had stolen. He then grasped Hayes by the collar and pulled a pistol from his pocket, whereupon Hayes caught his arm and the gun was discharged. Hayes got the gun away from appellant, hit him on the head with it, threw him down, and held him. While down appellant called to his family, asking some one to get a gun and shoot Hayes. He was held by Hayes for some time, estimated to be about half an hour, until a neighbor came and tied him. Shortly thereafter the deputy sheriff appeared and arrested appellant; but the record does not show that the difficulty between Hayes and appellant was in any manner connected with his arrest.

■ Was the evidence admissible over the objection of defendant? If it was related to and tended to prove the crime charged it was not inadmissible simply because it also proved or tended to prove defendant guilty of another crime. Evidence tending to prove the charge cannot be excluded if otherwise competent merely because it may put defendant in a more unfavorable light by showing him guilty of another offense; but where evidence has no direct relation or tendency to establish the charge, evidence of other crimes is ordinarily not admissible. There are exceptions to that rule arising in cases where an essential element of the crime charged is not susceptible of direct proof, such as knowledge or intent, and evidence of other similar crimes tends to prove such essential element of the crime charged.

■ Such evidence was therefore not admissible, unless it was a part of the res gestae, or, if not a part of the res gestae, was so connected with the homicide as a circumstance tending to establish the homicide and its character or defendant's connection therewith, or, if neither, it would nevertheless despite its disconnected position throw light upon an essential element of the crime charged. If it can be so classified it was admissible; otherwise not.

■ ■ The Attorney General argues that the conduct of defendant following the shooting of Wasson was a part of the res gestae and therefore admissible as such. He cites a number of cases involving the question of when evidence is and when it is not a part of the res gestae. We do not deem it necessary to review those cases or give this question any considerable attention. We think the evidence now under consideration is not in any sense res gestae. Each occurrence testified to was a considerable time after the shooting; no statements were made concerning the shooting; no act was in any way connected with it; and each and every act or statement might have been as consistently performed or made if there had been no homicide or any trouble with Wasson.

Did such evidence in any way tend to prove the crime charged? It had no direct bearing on the crime, nor was any of it of such a character as to give rise to an inference that appellant had committed an earlier crime. Acts subsequent to a homicide sometimes tend to prove the identity of the slayer. Where they do they are admissible for that purpose. In the case of State v. Garrington, 11 S. D. 178, 76 N. W. 326, the state was permitted to show that the defendant spent certain money, and this court said: "The acts of defendant thus disclosed occurred during the eight hours intervening between the time Erikson was last seen alive and when his dead body was discovered. It was certainly competent and relevant to show the defendant's whereabouts and conduct at any time during this period." In that case, however, the identity of the slayer had to be proven by circumstantial evidence, and the evidence offered, although slight, may have had some tendency to identify the slayer. In this case there is no question of identity. Defendant admits the killing. There were at least two witnesses to the killing, and there was no need of any circumstantial evidence concerning the identity of the slayer. The conduct of accused after the homicide may evidence a desire to elude discovery, to conceal the crime

or evidence of it, or to fabricate a defense, or may show malice toward deceased, or a motive for taking his life; where it does such evidence is admissible as tending to prove the crime charged. In this case there was no flight or concealment or apparent fear or motive shown by the conduct of appellant subsequent to the homicide. We are unable to see how such evidence in any way tended to prove the crime or any element thereof. Evidence of circumstances subsequent to the homicide, which are not of the res gestae and throws no light upon the killing or any of the issues of the case, is not admissible. Bird v. U. S., 180 U. S. 356, 21 S. Ct. 403, 45 L. Ed. 570; Bigham v. State, 203 Ala. 162, 82 So. 192; Darden v. State, 73 Ark. 315, 84 S. W. 507; People v. Wong Loung, 159 Cal. 520, 114 P. 829; Garcia v. People, 59 Colo. 434, 149 P. 614; Gibbons v. State, 137 Ga. 786, 74 S. E. 549; People v. Willy, 301 Ill. 307, 133 N. E. 859; Dunn v. State (Ind. Sup.) 67 N. E. 940; Id., 162 Ind. 174, 70 N. E. 521; State v. Keehn, 85 Kan. 765, 118 P. 851; State v. Kennade, 121 Mo. 405, 26 S.W. 347; People v. Buffom, 214 N. Y. 53, 108 N. E. 184, Ann. Cas. 1916D, 962. See, also, 30 C. J. 204.

The principal issue in the case at bar was whether or not defendant was justified in killing the deceased in defense of his person. That issue must necessarily depend upon the facts and circumstances surrounding the homicide and the danger or apparent danger in which appellant found himself when he killed his adversary. None of the evidence of his subsequent conduct throws any light on that issue. The court erred in admitting such evidence.

██ The Attorney General argues that, even though its admission may have been error, the evidence of the crime is so strong that appellant was not prejudiced thereby. Section 4940, R. C. 1919, provides: "Neither a departure from the form or mode prescribed in this title in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant or tended to his prejudice, in respect to a substantial right." And section 5044, R. C. 1919, in reference to the judgment of this court where error appears, provides: "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

These sections are not always easy of application, and it is

sometimes difficult to determine when an error is prejudicial and affects a substantial right and when it does not. No hard and fast rules can be laid down as a guide; but the safest way is to allow the law to develop by judicial decisions in cases as they arise involving the question. There is a discussion of the effect of a constitutional provision of California, having for its object the same purpose, although different in language, in People v. O'Bryan, 165 Cal. 55, 130 P. 1042, wherein it is said: "It may well be that the court, after examining the 'entire cause including the evidence,' is of the opinion that the error complained of, whatever its character, has not resulted in a miscarriage of justice. The mere fact that the assignment of error is based upon a provision of the Constitution is not conclusive. The final test is the opinion of the appellate court upon the result of the error. No doubt this view requires the court, to some extent, to weigh the evidence, and form conclusions upon its weight—a function which, heretofore, has been reserved for the jury. But it cannot be doubted that the legislators, in proposing the amendment, and the electors, in adopting it, intended to put upon the courts the performance of just that function. * * * Where the jury has found him guilty, we must, upon a review of the entire record, decide whether, in our judgment, any error committed has led to the verdict which was reached. If it appears to our satisfaction that the result was just, and that it would have been reached if the error had not been committed, a new trial is not to be ordered."

In determining whether or not defendant has been prejudiced or any substantial right of his has been invaded by reason of the error, we should consider the evidence of the defendant, if he has testified, and the evidence of any of his witnesses or exhibits. If we can say, after giving to such evidence a construction most favorable to the defendant, that such evidence supports the verdict, and no other verdict could be consistently rendered and such evidence be true, we may then properly say the error in admission of improper evidence, which may have influenced the jury in arriving at their verdict, was not prejudicial and did not affect a substantial right. In State v. Schultz (S. D.) 217 N. W. 213, we held that where defendant had testified to a state of facts showing him guilty of the charge (embezzlement), he had no right to complain if the jury believed him, and he was therefore not prejudiced by evidence

improperly admitted. In the instant case appellant testified in his own behalf and gave his version of the facts surrounding the tragedy; but the facts as related by him are not so conclusive as to preclude the jury from finding any other verdict without disbelieving his testimony. The circumstances were such that the jury might have found appellant guilty of some other degree of homicide and not murder. We cannot say that the evidence of appellant was so conclusive against him that the admission of improper evidence did not prejudice his substantial rights,. He had a right to a trial by a fair and impartial jury upon competent evidence, uninfluenced by inadmissible evidence of other crimes and conduct which would naturally tend to bias and prejudice the jury against him.

■■ There is one other question presented by proper assignment of error that ought to be decided, as it is likely to arise in a subsequent trial. The court refused an instruction taken from the case of State v. Wilcox, 48 S. D. 289, 204 N. W. 369, which this court held was error to refuse in that case. It is an instruction to the effect that appellant was where he had a lawful right to be when he committed the act. It is argued that he was on the section line highway, and, although on the west side of the fence along Wasson's cultivated land,within the inclosure surrounding his fields, that being on the highway, appellant had a lawful right to be there, and deceased had no right to object or interfere with him. The Wilcox Case involved a conflict arising between a person claiming right to possession of a farm on which there was a crib of corn and the person claiming the corn in the crib who was at the time of the trouble engaged in moving the corn. This court held in that case such instruction should have been given. But the facts in that case were very different from the facts in this case. There the landowner had nailed up a crib and was trying to prevent a removal of the corn. Deceased was armed with a shotgun, was making a hostile demonstration with it, and actually fired the gun at or about the time he was killed. A judgment of ouster had been introduced in evidence, and the question of the right of appellant to be where he was at the time he fired the fatal shot was material as affecting the degree of the crime, his right to resist deceased, and whether or not he was the aggressor. Here no such question is involved, and such instruction has no application to the facts of

this case. One's right upon a highway may depend upon too many circumstances to justify a general instruction to the effect that the appellant when on the highway is where he has a lawful right to be. He has a lawful right to use the highway for travel so long as he does not interfere with the same right of another using the highway for that purpose, but such use is restricted to his needs. What circumstances will justify the use of unused and obstructed portions of a highway may present many complicated legal questions not here involved. Under the facts of this case there was nothing to indicate a necessity for the use which appellant was making of that portion of the highway, nor is there any evidence that deceased was trying to drive him therefrom. The evidence simply shows a quarrel between the parties, both on the highway, chiefly resulting from an old feud, with no relation to the use of the highway except, perhaps, a threat on the part of appellant that he would get out of the inclosure without going through a gate. As to whether or not he did or did not have a lawful right to do so is not involved in the case, and the court did not err in refusing to give such instruction.

As a reversal of the case is necessary, no other assignments of error need be considered, as the questions presented are not likely to arise in a new trial. The judgment and order appealed from are reversed.

MISER, C., sitting in lieu of BROWN, J., absent.

SHERWOOD, P. J., and POLLEY and MISER, JJ., concur.

CAMPBELL, J. (concurring specially). I think improper evidence was admitted over the objection of defendant and to his prejudice, and I concur in the view that the judgment and order appealed from must be reversed.