STATE, Respondent, v. KAISER, Appellant.

(235 N. W. 366.)

(File No. 7036.   Opinion filed February 27, 1931.)

P. A. Hosford, of Winner, for Appellant.

M. Q. Sharpe, Attorney General, and Herman L. Bode, Assistant Attorney General, for the State.

CAMPBELL, J. Defendant and one Charles Eloe were jointly informed against for larceny of a hog.. Eloe entered a plea of guilty, and was a witness at the trial of defendant, who pleaded not guilty.  Defendant was a witness in his own behalf, and his testimony was not entirely identical with the testimony of Eloe, through their stories coincided in many respects.

The evidence of Eloe and defendant, with their principal points of variance, may be thus summarized:  Eloe and defendant were acquaintances.  They met in Lead, S. D., on December 20, 1928. They left Lead together on December 22d, in defendant's car; thence they went to Rapid City; thence to Hot Springs; and then started for Carter, S. D., and arrived at the home of Frank Eloe (a brother of Charles Eloe) in Todd county about 4 o'clock in the morning of December 26th.  They remained there during the day of the 26th until just about sundown, when they again set forth in defendant's car with defendant driving.  Charles Eloe testified that they went out intending to steal some chickens.  De-

fendant says that they were starting for the home of defendant's brother. They had in the car between them a shotgun belonging to Charles Eloe which they had been using to shoot rabbits. Presently two animals crossed the road in front of the car. They were Chester White brood sows weighing about three hundred and seventy-five pounds apiece. Eloe says that both he and defendant plainly saw the animals and knew what they were; that defendant immediately stopped the car, grabbed the shotgun, and started after the hogs; that he called to Eloe to drive the car out of the road; that defendant shot one of the hogs, and with the assitsance of Eloe cut its throat and loaded it into defendant's car. Defendant, however, says that, when the two animals were seen crossing the road, they were some distance away (which he estimates at twenty-five rods), and that Eloe said, and he (defendant) thought, the animals were coyotes. Defendant says that he stopped the car to permit Eloe to get out and shoot one or both of the coyotes; that Eloe did get out with the shotgun and started off across the field while he (defendant) drove the car down the road a little ways and then heard Eloe shoot. Then according to defendant's story, "I went over to see whether he got the coyote and when I got there he said he had shot a hog. He said he took it for a coyote. He wanted to leave it but I told him the right thing would be to take it in, turn it over to some officer and settle for it. We took it along but we did not know where to take it. I did not know of any officer but this Herman. We took it over there. I knew he was a Constable. I asked him if we could leave the hog until we could settle for it and he said he would not have it there. He told us to put it away in a straw stack until we found out who it belonged to and then pay for it. At the time it was killed I did not know whose hog it was."

Both defendant and Eloe agree that the slaughtered animal was loaded into the automobile of defendant by their joint efforts, and defendant and Eloe drove away; that just before they started to drive away they saw the lights of another car approaching from the west and hastened their own speed on that account. In the course of their activities in getting the car off the road, or back on the road, or loading the hog into it they had lost a suitcase which had been in the car, belonging to Eloe. Eloe says that he wanted to stop and hunt for his suitcase, but defendant said they

would be caught. Both agree that, instead of making any search for the suitcase, they returned to the home of Frank Eloe (about three or four miles), and from there sent two nephews of Eloe back to look for the suitcase, which the boys failed to find, the suitcase having in the meantime (as later developed) been picked up by the occupants of the car whose approach was observed as Eloe and defendant left the place where the hog was slaughtered. Both agree that from the Frank Eloe place defendant and Charles Eloe, still driving defendant's car with the slaughtered animal therein, drove about seventy-five miles to the home of a cousin of defendant by the name of Otto Herman, who lived on a farm in eastern Mellette county, S. D. (the hog having been killed in western Todd county), where defendant and Eloe hid the carcass of the animal in a straw stack about midnight of December 26th. The following testimony indicates Eloe's version of this part of the transaction:

"A. I asked what he was going to do with it. Well he said he didn't know. He said, 'We could leave it at your place and you and your wife clean it up and sell it.' I said, 'No, I don't want nothing to do with the hog.' I said, 'You couldn't leave that there because the officers will be there the first thing because I lost my suitcase, they can trace that up there.'

"Q. What did he say then? A. He finally thought a minute and he says, 'I think I know where we can go, up north, a cousin northwest of Carter, we might—could leave it over there, take it over there and have him dress it and dispose of the meat.'"

Defendant testified without objection that he did not attempt in any way to make use of any part of the hog, and it is undisputed that the carcass hidden in the straw stack on the Herman farm (about seventy-five miles from the place where the animal was killed) about midnight on December 26th remained there until it was discovered and taken away by the sheriff on December 28th. Everyone agrees that the hog was killed by being shot in the head with a shotgun, and it is apparent that the shooting was at very close range, for the sheriff says without dispute:

"The marks on the hog at the time I found it looked as if it had been shot with a shotgun. There was a hole in its forehead a little bigger than a shell the size of the shell, and its throat was cut."

At the trial, the following questions addressed to the defendant by his counsel were objected to, and objections sustained:

"Q. At the time that you took that hog away from there did you intend to deprive the owner of the hog or did you intend to settle for the hog?

"Q. Mr. Kaiser, what, if anything, did you do after the hog was left there by the Heinert place with reference to making preparation to settle for it and ascertaining to whom it belonged?

"Q. Mr. Kaiser, you may state whether or not at the time you took the hog away or assisted in taking it away from the place where it was shot as you say by Charley Eloe you took it away with any intention on your part to benefit from it or use it or permit anybody else to use it.

"Q. Mr. Kaiser, at the time you say you helped to load this hog and take it away from the place there and took it up near Mr. Heinert's place where it was left, did you intend to steal Mr. Weise's hog?

"Q. Mr. Kaiser, at the time that you assisted in loading that hog up and taking it away to the place where you left it near Mr. Heinert's in company with Mr. Charles Eloe did you expect to derive any benefit from the taking of that hog?

"Q. Mr. Kaiser, at the time that you loaded the hog into the car and at the time you assisted in taking it out to the place near Mr. Heinert's where the hog is shown to have been left you may state whether or not you did that with the intention of stealing the hog, or with any intention, and if there were other intentions, what those intentions were.

"Q. Mr. Kaiser, prior to the time of your arrest and prior to the time that you were informed of the filing of any information in this case you may state what, if any steps you took with reference to the ascertaining the ownership of the hog and making settlement for the loss sustained by the owner."

Defendant made formal offers of proof to the same general tenor and effect as the foregoing questions, and also made the following offer:

"For the purpose of showing intent and for the purpose of showing there was no intent on the part of the defendant to steal the hog or deprive the owner of anything, the defendant offers to prove that he arranged with his father, Philip Kaiser, to ascer-

tain whose hog had been killed and to make settlement for the loss to whoever the owner was and that before the arrest of the defendant Philip Kaiser ascertained who the hog belonged to and before he was informed of the arrest of the defendant he offered to settle with Mr. Weise for the loss of the hog. The defendant offers to prove the same thing by the testimony of Philip Kaiser himself and that Philip Kaiser was at the time of making the offer of settlement with Mr. Weise able to pay the value of the hog."

Objection to the offers was sustained.

The court instructed the jury in part as follows:

"The intent referred to in our statute defining larceny is a quality or condition of mind and cannot be shown by direct evidence, but must be determined from all of the facts and circumstances shown by the evidence. Any person so acting, either in actually taking or removing the property or in so aiding or abetting would be guilty as principal."

To the instruction above quoted, and particularly the portion thereof stating that intent cannot be shown by direct evidence, defendant excepted.

The jury returned a verdict of guilty, and thereupon the court pronounced judgment sentencing defendant to three years in the penitentiary, from which judgment and a denial of his motion for new trial defendant has appealed.

Appellant contends that the evidence is insufficient to corroborate the accomplice, Charles Eloe, within the requirement of section 4882, R. C. 1919, reading as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

It is sufficient in this connection to say, without stating the evidence more fully than we have heretofore done, that there was, in our opinion complete and ample corroboration of the testimony of the accomplice.

Appellant also predicates error upon the instruction of the court to which he excepted as hereinbefore stated and upon the rejection of testimony offered by him as hereinbefore set out.

■ We are of the opinion that the court erred in instructing the jury that specific intent, when a necessary ingredient of a crime, "cannot be shown by direct evidence." Within certain limits it is relevant for a defendant to state what intention was present in his mind when he participated in a transaction, and to state the motives which he claims prompted his actions. See Wigmore on Evidence (2d Ed.) § 581; State v. Johnson, 17 N. D. 554, 118 N. W. 230; note, 23 L. R. A. (N. S.) page 367.

Upon the same view of the law we think, as an abstract proposition, that some, though not all of the testimony offered and rejected is admissible. It is to be noted, however, that most of the rejected testimony was, as a matter of actual fact, mere repetition. Appellant had already testified before the jury without objection that he made no attempt to use any part of the animal after it was killed; that he knew nothing of the killing of the animal until he got out in the field and found that Eloe had killed it by mistake; that Eloe wanted to leave the animal there; that appellant said the right thing to do was to take it along and turn it over to some officer and settle for it; and that he took it to his cousin Herman, who was a constable, and put it in the straw stack until the owner could be ascertained and payment made. It is hard to see how appellant could hope much more plainly to put before the jury his claim that he was overflowing with good intentions and utterly unpossessed of evil intentions. Doubtless a defendant in a criminal case is entitled, to an extent dependent upon the circumstances of the particular case, to emphasize his fact contentions before the jury by some degree of repetition. How much repetition shall be permitted is, in a large extent, discretionary with the trial judge. It may well be doubted whether any abuse of such discretion appears in this case.

However, we think we need not consider in this case just what items of the offered testimony were admissible and what items were inadmissible, nor need the matter rest upon a support of the discretion of the trial judge in refusing to permit repetition. We are convinced in this case that the error of the court in its instruction and the errors (if any there were) in rejecting testimony were not prejudicial to the appellant.

Section 5044, R. C. 1919, reads as follows:

"After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

This statute has had the consideration of this court on numerous occasions. See State v. Riggs, 25 S. D. 275, 126 N. W. 509, 510; State v. Syverson, 39 S. D. 638, 166 N. W. 157; State v. Sjoberg, 54 S. D. 375, 223 N. W. 320; State v. Staley, 54 S. D. 552, 223 N. W. 943, 946. As set forth in State v. Riggs, supra:

'It will not do to say defendant was not prejudiced simply because we believe he was guilty. That is the logic of the mob when it executes one believed to be guilty without regard to any lawful modes of procedure."

The true rule, we think, is announced in State v. Staley, supra:

"These sections are not always easy of application, and it is sometimes difficult to determine when an error is prejudicial and affects a substantial right and when it is not. No hard and fast rules can be laid down as a guide; but the safest way is to allow the law to develop by judicial decisions in cases as they arise involving the question."

In the instant case, the appellant had fully stated his story to the jury, and had placed before the jury the substance of all his contentions. Appellant would have had the jury believe that he mistook a three hundred and seventy-five pound Chester White brood sow for a coyote. Inasmuch as appellant and Eloe had been using the shotgun for killing rabbits, appellant's story might have gained in consistency, if not credibility, had he testified that he thought the three hundred and seventy-five pound brood sow was a rabbit. Appellant would have had the jury believe that he knew nothing whatever of the killing of the hog until he got out in the field after hearing Eloe shoot and found the animal dead; that Eloe then told him he had shot the hog (which was shot in the forehead and at close range) thinking it to be a coyote; that Eloe's story was believed by appellant. It will be noted that at that stage of the proceedings, according to appellant's story, appellant had no connection whatever with the transaction. He had merely stopped his car at the request of Eloe to permit Eloe to shoot a coyote, and now discovered, to his astonishment and horror, that Eloe, without appellant's assistance or connivance, acting entirely as a free agent, had accidentally killed a hog. Appellant would

further have had the jury believe that Eloe, who, according to appellant's story, was the only man responsible for this unfortunate accident, desired to leave the animal there and go away, but that appellant, who was not 'connected' with nor responsible for the accidental killing of the animal, could not tolerate such evasion of responsibility by Eloe. Appellant would have had the jury believe that, for the purpose of repairing the injury unintentionally occasioned by Eloe's inability to distinguish a coyote from a three hundred and seventy-five pound hog, he (appellant) insisted that the owner should be found and settlement made. . Appellant would have had the jury believe that, for the accomplishment of this laudable design, and with no other purpose or motive, he thereupon assisted in cutting the throat of the animal and loading it into his automobile and taking it in the dead of night and hiding it away in a straw stack on the farm of his cousin, seventy-five miles farther away from the owner, and in another county, because his cousin was a constable.

The jury rejected this story of appellant in its entirety, and, as reasonable men, we do not see how they could have done otherwise. We are not able to see how the result could possibly have been different in this case if the erroneous portion of the instruction had been omitted and all the offered testimony had been received. Appellant's story was so utterly incredible and unworthy of belief that we do not think that he was prejudiced by the court's refusal (even if erroneous) to permit him to adorn his fantastic tale with further palpable perjury.

Other assignments of error taken by appellant have been considered and found to be without merit.

Upon the entire record, we are persuaded that no prejudicial error was committed, and the judgment and order appealed from are affirmed.

MISER, C., sitting in lieu of ROBERTS, J.

POLLEY, P. J., and BURCH, WARREN, and MISER, JJ., concur.