STATE of South Dakota, Plaintiff and Appellee,

v.

Phillip Don STEELE, Defendant and Appellant.

No. 18077.

Supreme Court of South Dakota.

Considered on Briefs Sept. 2, 1993.

Decided Jan. 5, 1994.

Minnehaha County State's Attorney's Office, and address a number of other issues raised by Steele that are capable of repetition on retrial.

## FACTS AND PROCEDURAL HISTORY

On January 3, 1992, A.S., the alleged victim, was a seventeen-year-old female living and working on her own in Sioux Falls. After spending the evening and early morning hours of the following day "cruising the loop" with friends, A.S. encountered Steele at a convenience store where he was looking for a ride home. A.S. left the store with Steele in her car at 3:16 a.m. on January 4. Later that morning, A.S. dropped Steele off at the bus depot located at 7th and Minnesota, then drove south to 41st and Minnesota where at 5:27 a.m., she signaled a police officer and reported a rape. Steele and A.S. had two very different versions of what happened that morning. A.S. testified to a continuous and brutal two and one-half to three hour rape, while Steele testified to two incidents of brief consensual sex. The issue for the jury was which version to believe, which witness was more credible.

Steele was arrested on January 4, 1992 and charged with Rape in the Second Degree in violation of SDCL 22–22–1(2). On January 9, 1992, the grand jury returned an indictment charging him with Rape in the Second Degree, and the State also filed a Part II Information alleging that he was a habitual offender under SDCL 22–7–7. At arraignment, Steele pled not guilty to both the indictment and the information. On February 13, 1992, hearing was held on the State's motion to introduce prior bad acts evidence at trial, which motion was granted by the court. A trial was held on April 22–23, 1992, and the jury returned a verdict of guilty to the rape charge. On May 4, 1992, Steele was re-arraigned on the Part II Information and he admitted the information at that time.

Prior to trial, the Defense sent a letter of discovery to the Minnehaha County State's Attorney's Office, and also relied on the circuit court's adopted rules of criminal discovery which require open files and disclosure of all information. Subsequent to the trial and

Mark Barnett, Atty. Gen., Patricia Cronin, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Patrick M. Schroeder, Minnehaha County Public Defender's Office, Sioux Falls, for defendant and appellant.

WUEST, Justice.

Defendant, Phillip Steele (Steele) appeals his rape conviction, raising multiple issues. We reverse the circuit court's denial of a motion for new trial based on newly-discovered evidence that was suppressed by the

conviction, A.S. volunteered to the Sioux Falls *Argus Leader* that she had contracted chlamydia,[1] a sexually transmitted venereal disease, from Steele. The State's Attorney later admitted that prior to trial, he possessed knowledge that A.S. had chlamydia, and claimed she had contracted it from Steele. The State also admitted discussing this evidence at a staff meeting in the office of the State's Attorney, resulting in a decision not to disclose this information to the Defense because, in the view of the State's Attorney, it was irrelevant and would be inadmissible. After the information became known to Steele through the newspaper story, he had himself tested for chlamydia, and the results of the test were negative. His wife also tested negative for chlamydia.

Sentencing was set for July 22, but was delayed for one week to allow hearing on the motion for new trial prior to sentencing. The trial court allowed A.S. to make her victim impact statement on July 22, and she offered to retract her statements alleging that she had gotten chlamydia from Steele. On July 29, 1992, hearing was held on the motion for new trial. The court denied the motion, and proceeded immediately to sentence the defendant to 100 years in the penitentiary. Steele appeals from this judgment and sentence.

## DISCUSSION

### 1. Motion for New Trial Based on Newly Discovered Evidence

■ The granting or refusing of a new trial upon the ground of newly discovered evidence is largely in the discretion of the trial court. Unless there has been an abuse of such discretion, this court will not interfere with the action of the trial court upon such motion. *State v. Willis*, 396 N.W.2d 152, 153 (S.D.1986) (Willis II) (citing *State v. Lufkins*, 309 N.W.2d 331 (S.D.1981); *State v. Martinez*, 88 S.D. 369, 220 N.W.2d 530 (1974)). *See also State v. Feuillerat*, 292 N.W.2d 326, 333 (S.D.1980) (citing *State v. Gerdes*, 258 N.W.2d 839 (S.D.1977); *State v. Coleman*, 17 S.D. 594, 98 N.W. 175 (1904); *Wilson v. Seaman*, 15 S.D. 103, 87 N.W. 577 (1901)).

We note at the outset that this is not the first time that this court has been called upon to examine the actions of the Minnehaha County State's Attorney's Office in suppression of evidence. In at least one other case, we reviewed a situation where the prosecution knew that the alleged victim in a pending rape case brought second rape charges against another individual. *Willis II*, 396 N.W.2d at 153–54. The Sioux Falls Police Department investigated and filed a report, but the State's Attorney decided not to bring charges. *Id.* at 153. It was undisputed that "[n]o mention of this alleged rape was ever made to Willis or his counsel inspite [sic] of direct and continuing requests for any exculpatory evidence." *Id.* In his defense, Willis alleged that he had the consent of the victim. *See State v. Willis*, 370 N.W.2d 193, 195–96 (S.D.1985) (Willis I). After analyzing the actions of the State's Attorney's office, this court stated that, "We certainly do not condone the activities of the Minnehaha County State's Attorney's Office in handling this newly discovered evidence. We do not believe, however, that there is a reasonable probability that this evidence would probably produce a different result at a new trial."[2]

---

1. Chlamydia is a venereal or sexually transmitted disease, included in the same category as gonorrhea, syphilis and genital herpes. "Sexually transmitted diseases (STD), also called venereal diseases (VD), are all highly contagious between sexual partners. They are passed from one person to another through sexual intercourse or close contact involving the genitalia, mouth or rectum. The STD are surpassed only by the common cold and flu among common infectious diseases in the United States.... *Chlamydial* infections are even more common than gonorrhea, and like gonorrhea are a frequent cause of pelvic inflammatory disease." 5A Lawyers' Med-

ical Cyclopedia of Personal Injuries and Allied Specialties § 36.18(A) (3rd ed. 1986).

2. This court, in reviewing Willis' motion for new trial based on the newly discovered evidence, applied the two-fold test as set out in *Lufkins*, 309 N.W.2d at 336. *Willis*, 396 N.W.2d at 153. That test is: (1) Is the evidence cumulative; and (2) is there a reasonable possibility that the newly discovered evidence would probably produce a different result on retrial? *Id.* However, it is questionable whether this test imposes additional requirements beyond that required by the U.S. Supreme Court in a suppression of evidence claim. Neither *Lufkins*, or the case cited therein

*Willis II,* 396 N.W.2d at 154. It appears from the present case that although the Minnehaha County State's Attorney's Office has been reprimanded by this court for suppression of evidence, that office relies on the fact that in hindsight, this court will decide that the defendant would have been convicted anyway. Rather, the concern should be with the fundamental fairness of the prosecution at the outset.

■ Suppression of evidence by the prosecution goes directly to the fundamental fairness of the trial, the basic due process rights of the accused. We look to the words of the U.S. Supreme Court in what has become known as the *Brady* rule case: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). The Court later explained the *Brady* rule stating, "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence *might* have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (emphasis added). After reviewing the entire line of cases stemming from *Brady,* we stated: "Thus, where [the defendant] was not aware of the evidence, if the evidence is both favorable and material, and he has made a request for the evidence, there has been a due process violation." *Ashker v. Solem,* 457 N.W.2d 473, 477 (S.D.1990). In other words, four questions are to be answered when there is suppression of evidence by the prosecution. If the answers to these four questions are in the affirmative, the defendant's due process rights have been violated and a new trial must be granted:

(1) Was the defense unaware of the evidence?

(2) Is the evidence favorable to the defense?

(3) Is the evidence material to the defense?

(4) Did the defense make a request for the evidence?

Evidence is *favorable* where it creates a reasonable doubt that did not otherwise exist. *Ashker,* 457 N.W.2d at 477 (citing *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)). The U.S. Supreme Court has stated that "The evidence is *material* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (emphasis added). *See Ashker,* 457 N.W.2d at 477.

■ As outlined previously, it was only through a post-conviction news story that the Defense discovered A.S.'s allegations that she contracted chlamydia from Steele. The Alabama Supreme Court was faced with a similar situation to that presented here. *Ex parte Geeslin,* 505 So.2d 1246 (Ala.1986). In *Geeslin,* two weeks after defendant's conviction of rape, the defense attorney discovered evidence that the standard rape examination performed on the victim included a vaginal smear showing the presence of gonorrhea. *Geeslin,* 505 So.2d at 1247. It was undisputed that the prosecutor never revealed to the defense that the victim's gonorrhea test was positive while the defendant's test was negative, in spite of a discovery request for all information held by the prosecution. *Id.* at 1246–47. Prior to trial, the prosecuting attorney even spent time preparing expert testimony to show that the defendant's negative test result could have been affected by antibiotics taken during the time period between the alleged rape and the defendant's gonorrhea test. *Id.* at 1247. However, no information regarding the gonorrhea testing was

from which the two-fold test is derived dealt with a new trial motion based on a suppression of evidence claim. *See State v. Dowling,* 87 S.D. 532, 211 N.W.2d 572 (1973). It appears that

guidance from the U.S. Supreme Court cases is more correctly applied in the more recent case of *Ashker v. Solem,* 457 N.W.2d 473, 477–78 (S.D. 1990) discussed herein.

.

.

.

used at trial. When the defense discovered the facts about the gonorrhea tests, motion for new trial was filed on the ground that "the State had failed to comply with the pretrial order for production of exculpatory matter known to the State." *Id.* Denial of the motion was at first affirmed, *Geeslin v. Alabama,* 505 So.2d 1242 (Ala.Crim.App.1986), but later reversed by the Supreme Court of Alabama. *Geeslin,* 505 So.2d at 1248, *cert. denied, Alabama v. Geeslin,* 481 U.S. 1037, 107 S.Ct. 1974, 95 L.Ed.2d 814 (1987). In its decision, the Alabama Supreme Court repeated the *Brady* principles, including the point that, " 'Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.' " *Geeslin,* 505 So.2d at 1247 (quoting *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (citing *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935))). The court held that the district attorney's failure to produce or inform the defense of the gonorrhea test results was a "suppression," despite the state's urging that the defense should have known about or discovered these test results on their own. *Id.* at 1248. The court noted that the prosecution obviously thought this was important evidence, since the district attorney "went to considerable effort to develop rebuttal evidence against it." *Id.* The court also saw these test results as having a "significant potential effect" on the jury's determination of the defendant's guilt or innocence, and concluded that, "Because the assistant district attorney's failure to comply with the motion to produce exculpatory evidence adversely affected the fundamental fairness of Geeslin's trial, Geeslin was denied his right not to be deprived of liberty without due process of law." *Id.* (citing U.S. Const., amend. XIV and the Alabama State Constitution).

In the present case, Steele's defense was that he believed he had the consent of the alleged victim. Steele and A.S. told two very different versions of the events of that night. The victim's version was that the assault lasted for two and one-half to three hours and consisted of continuous and repeated assaults.[3] Steele's version was that there were a couple of attempts to have intercourse and also oral sex, but that these did not last very long and terminated after a short period of time. Information hurriedly put together by the Defense, so that the new trial motion hearing could be held the same day as sentencing,[4] tended to show that the male's chances of contracting chlamydia increase as the number of sexual contacts increases. The fact that both Steele and his wife tested negative for chlamydia, while the alleged victim tested positive should have been given to the jury so that this could be weighed along with other evidence as they decided which version of the events was more believable. Further, the Defense argues that A.S.'s public accusation that Steele infected her with a sexually transmitted disease without any real basis for the accusation, and her later offer of retraction, goes directly to her credibility. Again, credibility was a key issue in the trial, and this information may well have raised a reasonable doubt in the minds of jurors. The Defense also argued that had the State revealed this information prior to trial, it could have influenced other decisions made regarding trial strategy; *i.e.,* the Defense may have rested at the end of the State's case and relied on whether or not they had proven their case beyond a reasonable doubt.[5]

The State suggests that Steele may have contracted chlamydia, but that it could have self-resolved, or cleared up by prescription medicine taken by Steele while he was in jail. However, if the State had not suppressed the evidence at the outset, Steele could have

**3.** The record reveals undisputed evidence that two hours and eleven minutes elapsed from the time they left the convenience store, until the time the rape was reported. A police officer also testified that he timed the route driven from the convenience store to the alleged crime scene, and the drive took fifteen minutes.

**4.** Holding both the new trial motion hearing and the sentencing on the same day gives the appearance that the court had already decided to proceed with sentencing, no matter what came out at the hearing.

**5.** Defense awareness of this information may also have influenced the offering of a plea agreement by the prosecutor.

been tested much closer to the time of arrest. The delay in testing was due only to the actions of the State, not the Defense. The State submits that there was nothing about this evidence that would have created a reasonable doubt in the minds of jurors. The question remains, however, that if the State thought this evidence was of such little use and consequence, why was a staff meeting held to discuss and decide that this evidence should be kept from the Defense?

▮ The circuit court's letter outlining the rationale for denial of the new trial motion shows its basis in the rape shield statute, SDCL 23A–22–15. If evidence was offered that the victim had chlamydia, and that she did not contract it from the Defendant, the jury would become aware that the victim had been engaged in some prior sexual contact with a third person. However, this is not "*specific instances* of a victim's prior sexual conduct." SDCL 23A–22–15 (emphasis added).[6] During the course of the trial, the jury became aware of other information indicating that A.S. was sexually active. Most importantly, Steele sought not to offer evidence on any specific instance of A.S.'s prior sexual contacts, as prohibited by the rape shield statute. Rather, the Defense sought to offer evidence that had direct bearing on the believability of the two versions of the events of January 4.

This suppression of evidence by the prosecution denied Steele his right to a fair trial as guaranteed by the due process clauses of the U.S. and our State constitutions. U.S. Const. amend. XIV, § 1; S.D. Const. art. VI, § 2. Therefore, the conviction is reversed and remanded for a new trial.

### 2. *Prior Bad Act Evidence*

▮ The trial court ruled that evidence regarding Steele's arrests of the same day for public indecency (urinating outside) and

disorderly conduct were admissible under SDCL 19–12–5.[7] This court has recently discussed this statute, noting that it is a rule of general *inadmissibility* with limited exceptions. *State v. Chapin*, 460 N.W.2d 420, 421 (S.D.1990). We also noted that trial courts must be "ever vigilant" so that the rule is not swallowed up by the exceptions. *Id.* (citations omitted). The process that must be followed by trial courts to determine admissibility under this rule involves two questions: First, is the intended purpose for offering the other acts evidence relevant to some material issue in the case? Second, is the probative value of the evidence substantially outweighed by its prejudicial effect? *State v. Basker*, 468 N.W.2d 413, 415 (S.D. 1991) (citing *State v. Dickey*, 459 N.W.2d 445, 449 (S.D.1990) (additional citations omitted)). *See also State v. Klein*, 444 N.W.2d 16, 18 (S.D.1989); *State v. Bradley*, 431 N.W.2d 317 (S.D.1988); *State v. Titus*, 426 N.W.2d 578 (S.D.1988); *State v. Champagne*, 422 N.W.2d 840 (S.D.1988). This balancing process is in the sound discretion of the trial court, and the trial court's determinations will not be disturbed absent an abuse of discretion. *Klein*, 444 N.W.2d at 18–19; *Chapin*, 460 N.W.2d at 421 (citing *State v. Houghton*, 272 N.W.2d 788 (S.D.1978)). However, and most importantly to the present case, we have stated that the balancing process undertaken by the trial court "*must be conducted on the record.*" *Klein*, 444 N.W.2d at 19 (citing *State v. Eagle Hawk*, 411 N.W.2d 120 (S.D. 1987)). *See also Titus*, 426 N.W.2d at 580.

▮ As occurred in *Chapin*, the trial court in the present case made findings that were "generic in nature," simply restating that the evidence of prior bad acts was admissible for the purpose of showing intent, preparation, plan and knowledge. *See Chapin*, 460 N.W.2d at 421. The trial court did not iden-

---

6. Other cases interpreting SDCL 23A–22–15 all involve situations where the defense sought to offer evidence about the victim's specific prior sexual contacts with either the defendant or other specific third persons. *See, e.g., State v. Woodfork*, 454 N.W.2d 332 (S.D.1990); *State v. Lykken*, 484 N.W.2d 869 (S.D.1992); *State v. Mitchell*, 491 N.W.2d 438 (S.D.1992).

7. SDCL 19–12–5 provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

tify the specific exception under which the bad act evidence was sought to be admitted, nor did it perform an analysis of the facts and nature of the prior bad acts. *Chapin*, 460 N.W.2d at 422. As stated by this court in *Chapin*, "Only by performing a meaningful analysis of each case can the courts assure that the exceptions do not, in fact, entirely swallow the rule of inadmissibility." *Id.* Because the trial court failed to perform the proper analysis, the conviction is reversible on this ground.[8]

### 3. *Admissibility of Photographs of the Defendant Where Identity is Not a Jury Issue*

Steele admitted to sexual contact with A.S.; his defense was consent. Nevertheless, the State obtained color photographs of Steele and had these enlarged and mounted. The close-up shots showed Steele barechested, and were clear depictions of the various Native American tattoos on his chest and arms. A.S. had already made an unchallenged positive identification of Steele, who in fact stipulated to the identification, and that he was involved in the incident. The Defense argues that admission of these photographs into evidence was improper, as it only served the State's purpose of arousing the jury with pictures of an Indian male with tattoos on his bare chest.

This court has generally considered admission of photographs into evidence. *See, e.g., Woodfork*, 454 N.W.2d at 337 (citing *State v. Swallow*, 350 N.W.2d 606, 610 (S.D.1984); *State v. Kane*, 266 N.W.2d 552, 558 (S.D. 1978)). We have stated that the trial court should "weigh the probative value of the photographs in resolving a material issue as against the dangers of prejudice to the appellant through needless arousals of the passions of the jurors." *Kane*, 266 N.W.2d at 558. However, we have not specifically addressed the situation where the defendant's identity is not an issue.

Other courts have discussed the offering of photographs of the defendant into evidence. *See, e.g., United States v. Reed*, 376 F.2d 226, 228 n. 2 (7th Cir.1967), *cert. denied*, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968). In *Reed*, the court stated:

> [W]e point out that there is grave risk in the introduction of photographs [of the defendant] where other evidence is produced or available to show the accused is the person who committed the crime charged. The character of the pictures themselves may carry prejudicial implications, through police notations or the appearance or pose of the accused in the photograph.... Where the existence of other evidence makes the use of photographs unnecessary, and there is no other reason for their use, their use, in itself, may imply that their purpose in evidence is to indicate to the jury that the accused has a history of convictions or arrests. In determining the relevancy of photographs, the balance of the possibility of prejudice as against the necessity of their use is one factor to be considered by the trial court.

*Id.* Likewise, the West Virginia Supreme Court has considered this issue. *West Virginia v. Reed*, 166 W.Va. 558, 276 S.E.2d 313 (1981). This case concerned admission of a photograph depicting the defendant in long hair at time of arrest, as opposed to short hair at time of trial. The court stated:

---

8. On retrial, the trial court may take guidance from other courts that have considered similar issues. In an appeal from a rape conviction, one court has held that it was error for the trial court to allow admission of evidence that the defendant had been arrested for "prowling" (peering through the window into the home of a woman) two days earlier. *Wisconsin v. Grant*, 139 Wis.2d 45, 406 N.W.2d 744, 746–47 (1987). The court stated that, "The potential dangers in admitting other-acts testimony are well known. Our rules of evidence do not allow this type of evidence to be admitted merely to show that the Defendant had a propensity to commit the type of acts for which he is charged." *Id.* at 747. In another

trial for attempted rape, the alleged victim was allowed to testify that the defendant and others were going to "do some cocaine" at a party on the same evening. *King v. Virginia*, 217 Va. 912, 234 S.E.2d 67, 68 (1977). The Virginia Supreme Court reiterated the "general rule that evidence that a defendant has committed an unrelated crime is inadmissible against him." *Id.* at 69. The court did note the exception that "evidence of other criminal acts is admissible where such evidence is connected with or leads up to the offense for which the accused is being tried. But the use of cocaine had nothing to do with the crime of attempted rape for which [the defendant] was being tried." *Id.*

We have always held that the admission of photographs rests in the sound discretion of the trial court and that its rulings will be upheld unless there is a clear showing of abuse of discretion. [Citations omitted.] *However, to be admissible photographs must be offered for some relevant purpose and must have probative value which outweighs any prejudicial effect.*

*Reed,* 276 S.E.2d at 318 (emphasis added).

Similarly, the Maryland Court of Appeals has considered the situation where photographs of a defendant are offered where his identity is not an issue. *Arca v. Maryland,* 71 Md.App. 102, 523 A.2d 1064 (1987). The defendant was charged with first degree murder, and convicted of manslaughter. The defendant's sole defense was that he acted in self-defense. "That appellant was the actor ... was never an issue at trial." *Arca,* 523 A.2d at 1064. The state moved into evidence a police photograph of the defendant. The defense objected based on relevance, arguing that identification was not an issue. Nevertheless, the trial court admitted a "sanitized" version of the police photograph, removing indications that this was a "mug shot" from the photograph. The court held that this was reversible error, stating:

In most cases where police photographs are offered, the identity of the defendant, either as the criminal agent or as a recidivist for enhanced punishment purposes, is at issue, and the photographs are offered to help establish that identity. [Citation omitted.] Here, as we have observed, identity was not in issue. The State had absolutely no need for the photographs—either the original array or a "sanitized" copy of them. *They simply were not relevant to any issue that the jury would be asked to decide.*

*Arca,* 523 A.2d at 1065–66 (emphasis added). In reaching its decision, the *Arca* court considered the tests utilized for admission of police photographs or "mug shots." Some federal courts apply a three-prong test which requires the state to show three elements. *See United States v. Harrington,* 490 F.2d 487, 494 (2nd Cir.1973). The *Harrington* court stated:

We perceive three prerequisites to a ruling that the introduction of "mug shot" type photographs does not result in reversible error:

1. The Government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

490 F.2d at 494. Courts applying this test state that all three prerequisites must be met so that admission of the photographs does not amount to an abuse of discretion. *See, e.g., United States v. Fosher,* 568 F.2d 207, 214 (1st Cir.1978); *United States v. Torres–Flores,* 827 F.2d 1031, 1037 (5th Cir.1987). The *Fosher* court, repeating the test set out in *Harrington,* further noted: *"While it should be clear to all, we reiterate that this test presupposes that the photographs themselves are relevant to a material issue at hand." Fosher,* 568 F.2d at 215 (citing Fed. R.Evid. 404(b) (emphasis added)).

Other courts have chosen to utilize the *Harrington* factors in the application of a balancing test, where in " 'the exercise of discretion, the trial court must balance the probative value of the mug shots against their prejudicial impact on the defendant.' " *Arca,* 523 A.2d at 1065 (quoting *Straughn v. Maryland,* 297 Md. 329, 465 A.2d 1166, 1169 (1983) (citing *United States v. Johnson,* 623 F.2d 339 (4th Cir.1980), *cert. denied,* 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980); *Connecticut v. Woods,* 171 Conn. 610, 370 A.2d 1080 (1976); *Illinois v. Jones,* 34 Ill. App.3d 103, 339 N.E.2d 485 (1975), *cert. denied,* 426 U.S. 953, 96 S.Ct. 3179, 49 L.Ed.2d 1192 (1976); *North Carolina v. Hatcher,* 277 N.C. 380, 177 S.E.2d 892 (1970))). *See also United States v. Oliver,* 626 F.2d 254 (2d Cir.1980); *United States v. Johnson,* 623 F.2d 339 (4th Cir.1980), *cert. denied,* 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980). A "critical element" in this balancing test is the state's need for the photographs. "[W]ere they merely cumulative to other unim-

peached evidence? If the State has no real need to introduce the photographs, there is nothing against which to balance any prejudice to the accused." *Arca,* 523 A.2d at 1065. When the photographs are not relevant to any issue that the jury must decide, "the State's side of the scale, then, has a weight of zero." *Id.* at 1066.

The photographs of Steele were not relevant to any issue that the jury was asked to decide. Steele's identity, whether he had tattoos, and whether he is a Native American were not issues for the jury. Since there was no probative value whatsoever to these photographs, the prejudice caused to Steele cannot be "outweighed," and it was error for the trial court to allow these photographs into evidence.

### 4. *Jury Instruction on Credibility of Alleged Victim*

■ The trial court gave the following jury instruction offered by the State, over the objections of the Defense:

> In order for the Defendant to be convicted of the offense charged in the indictment, it is not necessary that the testimony of the victim be corroborated by other witnesses. It is sufficient if you find her testimony credible beyond a reasonable doubt.

During settling of the jury instructions, the Defense asked if this was a "stock" instruction. The State replied that it was not, but that it was from the case of *State v. Willis,* and the trial court indicated that it had checked the citation. It was the Defense position that this instruction was misleading, placed too much weight on the testimony of A.S., and was unnecessary since there was already a jury instruction regarding the credibility of the witnesses.

■ Authority for this jury instruction cannot be located in either *Willis* case. *See Willis I,* 370 N.W.2d at 193; *Willis II,* 396 N.W.2d at 152. SDCL 15-6-51(b) on settlement of jury instructions states in part that, "It shall be insufficient to state generally that an instruction *does or does not* state the law, but it shall be necessary to specify clearly wherein any instruction, or part thereof objected to, is insufficient or does not state the law." *Id.* (emphasis added). Counsel

offering jury instructions, both defense and prosecution, should be prepared to offer the specific authority on which a proposed instruction is based. This allows a more fair and full discussion of proposed jury instructions, and aids the court in reaching decisions whether to accept or reject the instructions.

In regard to the present case, we have stated that "as a general rule, it is not essential to a sexual offense conviction that the testimony of the victim be corroborated by other evidence." *State v. Blalack,* 434 N.W.2d 55, 59 (S.D.1988) (citing *State v. Grey Owl,* 316 N.W.2d 801, 804 (S.D.1982)). Based on these prior holdings, the language contained in the first sentence of the instruction is appropriate. No authority is located to support the second sentence of the instruction, which is not even clear or complete on its face—sufficient for what? Therefore, the language of the second sentence of the instruction should properly be deleted.

### 5. *Testimony Regarding Steele's Place of Employment*

■ The trial court denied Steele's motion in limine asking that no testimony regarding his place of employment be allowed. Steele (and his wife) were both employed at Studio One, an adult theater and bookstore. Steele argues that any probative value of such testimony was outweighed by the prejudicial effect it could have on the jury. State opposed the motion, arguing that Steele's place of employment was part of the scheme of events leading up to the rape, which events the State planned to introduce as prior bad acts evidence. Further, Steele had told a police officer that he had seen A.S. in Studio One on some prior occasion. A.S. denied that she had ever been inside Studio One, and the State wished to use that for impeachment purposes.

State argues that Studio One was a "geographical center around which the events of that night revolved," and that Studio One was "the base of the Defendant's operations that night" and "an essential link in the chain." These arguments appear ludicrous. Steele and A.S. met at a convenience store that night, and left together from that loca-

tion at 3:16 a.m. Sometime before 5:27 a.m., Steele was dropped off outside the bus depot at 7th and Minnesota. His place of employment had no relationship to the events that occurred between Steele and A.S. Again, one wonders if Steele were a lawyer, a minister or a school teacher, would the State refer to his law office, church, or school building as his "base of operations"?

The State places much reliance on the "vehemence" of A.S.'s denial that she had ever been in Studio One. Although a clerk did not recall seeing A.S. in the store, she also testified that "many times" she had to ask people under eighteen to leave the store, especially around tournament time, and that she was not on duty twenty-four hours a day. Even if there were any relevance to mention of Steele's place of employment, the prejudicial effect of the evidence outweighs its probative value. *See, e.g., Woodfork,* 454 N.W.2d at 335 (citations omitted). In a rape prosecution, the fact that Steele worked at an adult bookstore and theater, even as a janitor, could have a highly prejudicial effect on the jury's perception that such a person would be more likely to commit a rape.

SABERS, J., concurs in part; concurs specially in part.

MILLER, C.J., and HENDERSON and AMUNDSON, JJ., concur in part and dissent in part.

SABERS, Justice (concurring in part; concurring specially in part).

I concur on Issues 1, 2, and 4, but I believe some of the evidence under Issues 2, 3, and 5 would be admissible on remand, if properly presented.

MILLER, Chief Justice (concurring in part and dissenting in part).

But for the appallingly lax procedure under which Steele was bonded out of jail after his second arrest, the tragic events of January 4, 1992, would probably never have occurred.

Steele was arrested shortly after 1:00 a.m. when a co-worker at Studio One, his place of employment, called the police and reported he was creating a disturbance. After being led outside by a customer, Steele returned and threatened to rape the co-worker. He went back outside, was seen urinating on a parked vehicle and was arrested for public indecency. He was booked into jail at 1:27 a.m. and, after posting a $50.00 bond, was released at 1:45 a.m.

Within twenty minutes, Steele had returned to Studio One. He continued his disturbance and made various threats, among them a threat to kill the co-worker. The police were called again. Steele was arrested, this time charged with disorderly conduct and, again, booked into jail at 2:26 a.m. In less than thirty minutes, despite the potential danger to the public, he was released after posting a $75.00 bond. Steele left the jail and walked across the street to a 7–Eleven where he encountered A.S.

The South Dakota Constitution provides that bail will be available for criminal offenses under most circumstances:

> All persons shall be bailable by sufficient sureties, except for capital offenses when proof is evident or presumption great. The privilege of the writ of habeas corpus shall not be suspended unless, when in case of rebellion or invasion, the public safety may require it.

S.D. Const. art. VI, § 8. This provision has been interpreted to mean that when an offense is bailable, the circumstances and amount of the recognizance is a matter of judicial discretion. *Langdeau v. State,* 85 S.D. 189, 191, 179 N.W.2d 121, 121–22 (1970) (citing *State v. Howard,* 185 Neb. 583, 177 N.W.2d 566, 567–68 (1970)).

A South Dakota statute sets forth the factors a judge must examine when determining the conditions of bail. SDCL 23A–43–4 provides:

> In determining which conditions of release will reasonably assure appearance, a committing magistrate or court *shall,* on the basis of available information, take into account the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the defendant's family ties, employment, financial resources, character and mental condition, the length of his residence in the communi-

ty, his record of convictions, his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings, and the risk that he will flee or pose a danger to any person or to the community. (Emphasis added).

The law requires that before bail is established, the factors set forth in SDCL 23A–43–4 must be considered. *Accord, Farmland Ins. Co. v. Heitmann,* 498 N.W.2d 620, 624 (S.D.1993) (stating "shall" in a statute is mandatory, not discretionary, language); *State v. Holmes,* 464 N.W.2d 612, 613 (S.D. 1990); *Helmbolt v. LeMars Mut. Ins. Co., Inc.,* 404 N.W.2d 55, 59 (S.D.1987).

South Dakota law allows designated persons to accept written appearances and bond. SDCL 16–2–21 provides in part:

> The presiding judge in each judicial circuit, to be appointed by the chief justice, subject to the rules of the Supreme Court, shall have administrative supervision and authority over the operation of the circuit courts, the courts of limited jurisdiction, and clerks and other court personnel in the circuit. These powers and duties include, but are not limited to, the following:

> \* \* \* \* \* \*

> (8) Promulgating a schedule of offenses for which magistrates or other designated persons may accept written appearances, waivers of trial and pleas of guilty, and establishing a schedule of fines and bails therefor[.]

While "other designated persons" may accept written appearances and bond as provided in a fine and bond schedule, that bond must be set in accord with the law.

The issue of whether the factors expressed in SDCL 23A–43–4 were considered before setting bail for Steele is not on appeal before this court. Nor does the record disclose any information about how or by whom the decision to release Steele on bond was made. However, considering that evidence available to the person setting bond showed Steele was drunk, belligerent, had twice created public disturbances necessitating police intervention, and had threatened to rape and kill a co-worker, it is not implausible to conclude that he would "pose a danger to any person or to the community." In addition, even minimal investigation would have revealed that Steele had a prior conviction for escape and four previous felony convictions, one for drug distribution. As Steele was released minutes after being booked, it is probable the factors were never considered.

SDCL 23A–43–4 is mandatory and *must* be considered before determining the conditions of release. I abhor the circumstances under which Steele was released that morning and trust that the authorities of Minnehaha County will take appropriate steps to insure that this never happens again.

### Motion for New Trial Based on Newly Discovered Evidence Jury Instruction on Credibility of the Alleged Victim

I concur in result on issue one, which grants a new trial based on the failure of the Minnehaha County State's Attorney's Office to disclose information under the *Brady* rule. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963); *Ashker v. Solem,* 457 N.W.2d 473, 477 (S.D.1990). I also concur on issue four, the jury instruction on credibility of the alleged victim.

### Prior Bad Act Evidence

I dissent on issue two as evidence of Steele's prior arrests on the evening of January 4, 1992, was admissible under both SDCL 19–12–5 (Rule 404(b)) and as part of a series of continuing acts resulting in the commission of a crime. Evidence at trial showed Steele had been drinking for three and one-half hours before he returned to Studio One to confront a co-worker. He called her a "backstabbing bitch," a "f-cking white pussy" and threatened "he had an eight-inch dick he could use on her." After a customer escorted him outside, he was observed urinating on a parked car and arrested for public indecency.

After bonding out of jail, he immediately went back to Studio One and again threatened the co-worker, "if I ever get ahold of you, I will kill you, you backstabbing bitch." This behavior continued and he was arrested, this time for disorderly conduct. The officer

who took Steele into custody described him as disheveled, belligerent and intoxicated.

Minutes afterward, improvidently bonded out of the Minnehaha County jail, Steele walked across the street to a 7–Eleven. His behavior at the convenience store so concerned the clerk that she wrote down a description of A.S. and the license plate number of the car when she saw Steele leave with the girl.[1]

This court has ruled that evidence concerning events directly before and leading up to a criminal act or a series of continuing acts which are helpful in understanding the main event are admissible as part of the *res gestae* or circumstances so closely connected as to be part of the happening. *State v. Bonrud,* 90 S.D. 185, 189–90, 240 N.W.2d 77, 79 (1976) (holding evidence of different crime committed against different victim minutes after crime charged was properly admitted as part of *res gestae* ); *State v. Burtts,* 81 S.D. 150, 155–56, 132 N.W.2d 209, 211–12 (1964). "Evidence when a part of the res gestae was proper if it was related to and tended to prove the crime charged although it also proved or tended to prove the defendant guilty of another crime." *Burtts,* 81 S.D. at 156, 132 N.W.2d at 212 (citing *State v. Staley,* 54 S.D. 552, 223 N.W. 943 (1929)).

The trial court cited *Bonrud* during the hearing on the admissibility of evidence. The court ruled that "the evidence of other acts [is] so closely related in time so as the whole situation may in actuality be considered as one continuous criminal enterprise." Steele's arrests for public indecency and disorderly conduct occurred less than two hours before he got in the car with A.S. He had threatened to rape and kill a co-worker. He was described as intoxicated and belligerent. I am convinced there was more than sufficient evidence to support the trial court's ruling admitting the evidence as part of a series of continuing acts.

Additionally, the court ruled Steele's prior acts that evening were admissible under SDCL 19–12–5 (404(b)). The court analyzed the facts, the similar nature of the acts, and

the time between incidents on the record at the motions hearing. *State v. Titus,* 426 N.W.2d 578, 580 (S.D.1988). The court found the other acts were admissible "for the purposes of showing intent, preparation, plan and knowledge." *See State v. Willis,* 370 N.W.2d 193, 198 (1985) (holding where rape defendant claims consent, intent is a material issue). Further, in contrast to *State v. Chapin,* 460 N.W.2d 420, 421 (S.D.1990), the jury heard testimony from the co-worker, a custodial police officer, and the 7–Eleven clerk, concerning the nature and facts surrounding the prior acts so it could determine for itself whether they established intent, preparation, plan and knowledge. *Cf. with Chapin,* 460 N.W.2d at 422 (finding where neither judge nor jury was presented with nature or facts surrounding prior bad acts, jury could only impermissibly infer that because defendant had committed prior crimes he was acting in conformity). In my opinion, the court did not abuse its discretion in admitting the evidence.

### *Testimony Regarding Steele's Place of Employment*

I also dissent to the majority's conclusion on issue five, the testimony regarding Steele's place of employment. Steele began his continuing series of acts in Studio One, the place where he received his paycheck before he started drinking. It was where he urinated in public and threatened to rape and kill a co-worker. It was the place he returned to when he got out of A.S.'s car, the place police arrested him, and the place A.S. identified him.

Most importantly, when he was first questioned by police, Steele indicated he had seen A.S. in Studio One on prior occasions, an accusation she vehemently denied at trial. This fact alone is extremely relevant to the credibility of both A.S. and Steele. Contrary to the majority's assertion that "his place of employment had no relationship to the events that occurred," it was an *integral* part of the continuing events on the night of

---

1. Approximately an hour after Steele and A.S. left the 7–Eleven, the clerk gave the note to an

off-duty policeman who reported it.

January 4, 1992. And yes, if one night a lawyer, a minister or a school teacher were to receive his paycheck, urinate in public, threaten to rape and kill a co-worker, be arrested for public indecency and disorderly conduct and then be dropped off next door by his rape victim, all at his law office, church or school building, I think the State would refer to his place of employment as his "base of operations."

The trial court did not exercise its discretion to an end or purpose not justified by, and clearly against, reason and evidence. *State v. Woodfork*, 454 N.W.2d 332, 335 (S.D. 1990); *State v. Bartlett*, 411 N.W.2d 411, 414 (S.D.1987). The trial court did not abuse its discretion in admitting evidence of Steele's place of employment. Moreover, in his ruling admitting the evidence, the trial judge limited the prosecution's reference to Studio One; "I am not going to let you dwell upon that particular fact in any undue length."[2]

### Admissibility of Photographs of the Defendant Where Identity is Not a Jury Issue

I also dissent as to issue three concerning admission of the photographs showing Steele's tattoos. Contrary to the majority's assertion, the identification of Steele was an issue at trial. The prosecution was required to prove beyond a reasonable doubt that Steele was the person A.S. accused of rape. Although the defense had offered to stipulate to Steele's identity, the prosecution rejected the offer.[3] *State v. Huth*, 334 N.W.2d 485, 489 (S.D.1983); *State v. Krana*, 272 N.W.2d 75, 79 (S.D.1978) (holding state is not required to accept defense stipulation if it wishes to present its case). It is a well-established general rule that the government is not bound by a defendant's offer to stipulate.

The reason for the rule is to permit a party "to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight."
*Parr v. United States*, 255 F.2d 86, 88 (5th Cir.1958) (quoting *Dunning v. Maine Central R.R. Co.*, 91 Me. 87, 39 A. 352, 356 (1897)), *cert. denied*, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958); *United States v. Spletzer*, 535 F.2d 950, 955 (5th Cir.1976); *People v. Nicholls*, 42 Ill.2d 91, 245 N.E.2d 771, 776 (1969); *State v. Gibb*, 303 N.W.2d 673, 682 (Iowa 1981); *State v. Saul*, 434 N.W.2d 572, 575 (N.D.1989).

Further, despite the majority's citation to a federal balancing test, the law in South Dakota is that relevant photographs are admissible when they accurately portray anything which it is competent for a witness to describe in his or her own words. *State v. Menard*, 424 N.W.2d 382, 383 (S.D.1988) (admitting photograph of defendant spotted with red substance not abuse of discretion when witness so described him); *Huth*, 334 N.W.2d at 489; *State v. Rash*, 294 N.W.2d 416, 418 (S.D.1980). "Even though photographs are somewhat gruesome, cumulative, or capable of arousing passion or prejudice in the jury, the admissibility of the photos is within the sound discretion of the trial court." *Huth*, 334 N.W.2d at 489.

Courts have repeatedly admitted photographs where a witness testifies concerning an assailant's appearance. *United States v. Weeks*, 919 F.2d 248, 253 (5th Cir.1990) (holding photograph was properly admitted to show defendant did have the tattoos witness described) *cert. denied*, 499 U.S. 954, 111 S.Ct. 1430, 113 L.Ed.2d 481 (1991); *State v. Cowans*, 503 So.2d 772, 774 (La.App.1987) (holding photographs depicting defendant's tattoos and deep tan were properly admitted as corresponding to witnesses' descriptions); *State v. Lane*, 791 S.W.2d 947, 953 (Mo.App. 1990) (finding photographs depicting defendant's scars and tattoos were properly admitted to corroborate victims' testimony); *Peo-*

---

**2.** I note that it was Steele himself who emphasized to the jury that Studio One was an adult theater and bookstore. "I says (sic) what are you doing here working at a pornography shop[.]"

**3.** This court frequently considers claims of ineffective assistance of counsel because the defense has stipulated to an element of the crime charged. Arguably, rejection of defense counsel's offer to stipulate to identity may prevent that issue from being raised in a habeas corpus action.

*ple v. Baez,* 131 A.D.2d 687, 516 N.Y.S.2d 764, 765 (N.Y.App.1987) (holding photograph was admissible to show defendant's appearance at time of the robbery).

A.S. described her assailant as having an unidentifiable tattoo on one arm, two tattoos on his chest and "from what I could tell they were swords." The photographs of Steele show two feathers tattooed on his upper chest and a tattoo on the upper part of each arm. Moreover, the pictures do not show any insignia, police notations, or other indication of being mug shots as in *United States v. Harrington,* 490 F.2d 487, 494 (2nd Cir.1973), the case relied on by the majority. In my opinion, the trial court did not abuse its discretion in admitting the photographs.

In summary, I concur in result in granting a new trial based on newly discovered evidence, concur the language in the jury instruction on credibility of the alleged victim should be deleted, and dissent as to the continuing and prior bad act evidence, the admissibility of Steele's place of employment and the admissibility of the photographs.

I strongly advise the authorities in Minnehaha County, and any other county where bonding procedures have become mere routine, to examine their policies to insure compliance with the law.

HENDERSON, Justice (concurring in part, dissenting in part).

I generally concur in the entirety of this opinion with the exception of the treatment of Issue II. I would agree with the discourse on Issue II were it not for the exception to the general rule that criminal conduct is admissible where the evidence is connected with or leads up to the offense for which the accused is being tried. Chief Justice Miller refers to the res gestae cases in South Dakota, viz, *Bonrud* and *Burtts.*

It is my opinion that evidence of acts constituting continuous offenses or criminal action is admissible under SDCL 19–12–5 (Rule 404(b)). *See State v. Roden,* 380 N.W.2d 669, 671 (S.D.1986); *State v. Means,* 363 N.W.2d 565, 568 (S.D.1985).

Undoubtedly, the evidence placed Steele at the 7–Eleven at the time he encountered the alleged victim; it also helped to explain how he was able to convince her to let him ride in her car. It is noted Steele himself utilized his prior conduct and his two arrests as part of his defense. Steele testified that because of these arrests the police officers knew he had been drinking and he felt they were "out to get him." *See* Jury Transcript at 283. Thus, he did not want to drive his car and he went to the 7–Eleven to try to find a ride. Jury Transcript at 238. Steele also testified that he told the 7–Eleven clerk about his arrests, and more importantly, he told alleged victim when explaining his need for a ride. Jury Transcript at 243. Therefore, under Steele's own theory, the fact that the alleged victim gave him a ride, knowing of his earlier arrests, helped to show that she was a much more willing participant that morning than she testified. Thereby, because of the foregoing defense, evidence of Steele's prior conduct was totally relevant.

AMUNDSON, Justice (concurring in part and dissenting in part).

The majority writer is absolutely correct in stating that the evidence regarding chlamydia should have been disclosed to the defense under the *Brady* rule. The trial court at its post-trial hearing also agreed that it should have been. After it is discovered that *Brady* evidence has been suppressed, a trial court has to determine whether or not the undisclosed evidence was material to the conviction. *United States v. Kelley,* 790 F.2d 130 (D.C.Cir.1986).

That is exactly what the trial court did in this case when it stated in its post-trial written opinion: "The question then becomes: What bearing does where the victim contracted chlamydia have upon any issues to be presented to the jury? And the answer is very simply none." I fully agree with this conclusion reached by the trial court. In this case, there was no testimony during trial by the victim charging this defendant with infecting her with this sexually transmitted disease. If, in fact, the prosecution had played upon this type of testimony to gain favor with the jury, I would certainly look at this case from a different perspective.

While discussing nondisclosed facts which could be used for impeachment purposes, the United States Supreme Court held:

> This court has rejected any distinction between impeachment evidence and exculpatory evidence. In *Giglio v. U.S.*, [405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)], the Government failed to disclose impeachment evidence similar to the evidence at issue in the present case, that is, a promise made to the key Government witness that he would not be prosecuted if he testified for the Government. The Court said:
>
>> When the 'reliability of a given witness may be determinative of guilt or innocence,' non-disclosure of evidence affecting credibility falls within th[e] general rule [of Brady]. We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to change the verdict...." A finding of materiality of the evidence is required under Brady.... A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...."

*United States v. Bagley*, 473 U.S. 667, 676–77, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481, 490 (1985) (citing *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108) (citations omitted).

By the holding on this issue, this court is automatically reversing based on the prosecution's failure to comply with the court's prior decision. This reaction totally disregards the fact that the issue of materiality is fact bound and the trial court found that where the victim encountered this sexually transmitted disease was factually immaterial to the rape prosecution. When a defendant testifies that he had sex with the victim, but it was with her consent, the only issue to be decided is "was there consent or was there not consent." A statement made to the press after the trial, which was obviously not under oath, should never amount to reversible error. Therefore, I dissent on this issue.

I totally concur with the majority position on the bad acts evidence. This court in *State v. Chapin*, 460 N.W.2d 420 (S.D.1990), sent a message to the practicing bar that this type of evidence should not be admitted based upon a "shotgun" or "smorgasbord" approach. After *Chapin*, this court veered off course in *State v. Werner*, 482 N.W.2d 286 (S.D.1992) (Justices Sabers and Amundson dissenting) and *State v. Christopherson*, 482 N.W.2d 298 (S.D.1992) (Justices Sabers and Amundson dissenting). With this holding, the court is back on course in requiring guilt or innocence to be determined by evidence relevant to only this particular charge and not by simply showing that the defendant had engaged in other bad acts, thus painting him as a bad person.

Further, I concur with that portion of Chief Justice Miller's dissent in part dealing with the admission of the photographs and the balance of the majority opinion.