2000 SD 22

**Randy Alan FOWLER, Petitioner and Appellee,**

v.

**Douglas WEBER, Warden of South Dakota State Penitentiary, Appellant.**

**No. 21069.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 2000.

Decided Feb. 9, 2000.

Michael B. Thompson, Sioux Falls, for petitioner and appellee.

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for appellant.

GILBERTSON, Justice

[¶ 1.] State appeals an order granting Defendant Randy Alan Fowler's (Fowler) application for writ of habeas corpus based on the claim of prosecution's suppression of evidence. We reverse.

## FACTS AND PROCEDURE

[¶ 2.] The facts are detailed in *State v. Fowler,* 1996 SD 78, ¶¶ 2–8, 552 N.W.2d 92, 94 (*Fowler I* ) and *State v. Fowler,* 1996 SD 79, ¶¶ 2–6, 552 N.W.2d 391, 392 (*Fowler II* ). In *Fowler I* we affirmed Fowler's conviction for the second-degree rape of Jane Doe [1] (Jane). Fowler was sentenced to twenty years in the state penitentiary.

[¶ 3.] In *Fowler II,* we affirmed Fowler's conviction of attempted second-degree rape, simple assault, and sexual contact of Sally Doe (Sally).[2] For this conviction Fowler was sentenced to twelve and one-half years on the attempted rape conviction and one year each on the two misdemeanor charges. The twelve and one-half year sentence was consecutive to the twenty-year prison term from *Fowler I.*

[¶ 4.] On January 5, 1998, Fowler filed an application for writ of habeas corpus. Fowler claimed in his application (1) his trial counsel in *Fowler I* was ineffective for twenty-one different reasons; (2) his trial counsel in *Fowler II* was ineffective for nine different reasons; (3) he was denied due process of law in his sentencing in *Fowler I;* and (4) he was denied due process of law in both *Fowler I* and *Fowler II*

---

1. The victim's name was changed to protect her privacy.

2. The victim's name was changed to protect her privacy.

because the prosecutor failed to provide requested evidence. Fowler specifically complains he was deprived of:

1. The civil deposition of Jane;

2. The videotaped statement of Jane taken by the military's Office of Special Investigation; and

3. The transcripts of two conversations between police chief Ensley and Sally.

Following a presentation of the evidence in this case, the habeas court rejected all of Fowler's claims, except the due process claims which argued the prosecutor had suppressed requested evidence. On June 3, 1999, the habeas court filed an order granting habeas corpus relief. State filed a motion for issuance of certificate of probable cause that was granted by the trial court. State now appeals the granting of Fowler's application for writ of habeas corpus. The State raises the following issue for our consideration:

Whether Fowler's due process rights were violated by the State's suppression of evidence.

## STANDARD OF REVIEW

[¶ 5.] On habeas review, the petitioner has the initial burden to prove by a preponderance of the evidence that he is entitled to relief. *New v. Weber*, 1999 SD 125, ¶ 5, 600 N.W.2d 568, 572 (citing *Lien v. Class*, 1998 SD 7, ¶ 11, 574 N.W.2d 601, 607). This Court will upset the habeas court's factual findings based on live testimony only if they are clearly erroneous. *Id.* (citing *Loop v. Class*, 1996 SD 107, ¶ 11, 554 N.W.2d 189, 191). We may affirm the ruling of the habeas court if we find it is "right for any reason." *Id.* (citing *Satter v. Solem*, 458 N.W.2d 762, 768 (S.D. 1990) (citing *State v. McCafferty*, 356 N.W.2d 159 (S.D.1984))).

[¶ 6.] The deposition, videotaped statement and two transcripts of oral interviews are documentary type evidence. "A trial

judge's superior fact-finding abilities relate to [its] opportunity to observe and evaluate live testimony ..." versus the appellate court which must review the same from a printed record. *First Nat. Bank of Biwabik v. Bank of Lemmon*, 535 N.W.2d 866, 871 (S.D.1995). When documentary or video evidence is offered, the trial court is in no better position to intelligently weigh the evidence than the appellate court. *Id.* As such, we review this disputed evidence de novo. *Watertown v. Dakota, Mn. & Eastern R. Co.*, 1996 SD 82, ¶ 11, 551 N.W.2d 571, 574.

## ANALYSIS AND DECISION

[¶ 7.] **Whether Fowler's due process rights were violated by the State's suppression of evidence.**

[¶ 8.] "Suppression of evidence by the prosecution goes directly to the fundamental fairness of the trial, the basic due process rights of the accused." *Fowler II*, 1996 SD 79, ¶ 22, 552 N.W.2d at 395 (citing *State v. Steele*, 510 N.W.2d 661, 665 (S.D.1994)). "However, not every case where the State has suppressed evidence results in a violation of a defendant's due process rights." *Id.* In *Black v. Class*, 1997 SD 22, 560 N.W.2d 544, we recently addressed the four-part test for determining whether a due process violation has resulted from the prosecution's suppression of evidence. 1997 SD 22, ¶ 16, 560 N.W.2d at 548. If the following four questions can be answered affirmatively, the defendant's due process rights have been violated and a new trial must be granted:

1. Was the defense unaware of the evidence?

2. Is the evidence favorable to the defense?

3. Is the evidence material to the defense?

4. Did the defense make a request for the evidence? [3]

3. Given our subsequent discussion of *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) this fourth requirement may not be applicable in all instances.

*Id.* (citing *Fowler II*, 1996 SD 79, ¶ 22, 552 N.W.2d at 395 (citing *Ashker*, 457 N.W.2d at 477)). Thus, failure by a defendant to establish any individual criteria in his or her favor under this test results in a rejection of this type of claim.

[¶ 9.] The allegedly suppressed evidence in the present case involves three items: 1) the civil deposition of Jane, 2) the videotaped statement of Jane, taken by the military's Office of Special Investigation, and 3) the transcripts of two conversations between Ensley and Sally. We address each piece of evidence separately.

[¶ 10.] *1. Civil deposition of Jane*

■ [¶ 11.] During the intervening period between the 1991 rape and the 1995 trial, victim Jane brought a civil action against Fowler and others alleging inaction of public officials concerning Fowler's behavior. As a result of the civil case, Jane was deposed on December 27, 1994. Fowler argues the civil deposition provides a different rendition of Jane's whereabouts and activities on the night of the rape.

The habeas court apparently agreed, although in its memorandum opinion the court only made the general statement, "[t]he deposition provides not only a different rendition of [Jane's] whereabouts and activities on the night of the rape, it also reveals other factors that might have contributed to her bringing the charges."

[¶ 12.] Fowler requested Jane's civil deposition and the record indicates Fowler's trial counsel, Phil Peterson, received a copy of Jane's civil deposition approximately one week before the criminal trial.[4] Apparently, Peterson had his paralegal compile all of the information in the case. There are several references made to Jane's civil deposition in the paralegal's report to Peterson. The cover letter attached to the report is dated January 17, 1995, approximately one week prior to the criminal trial. Therefore the deposition must have been in Peterson's possession some time prior to that date. The habeas court also indicated in its findings Peterson was in fact in possession of the deposition before trial. Moreover, Fowler now claims "Peterson knew of the deposition and that his deficient failure to attack [Jane's] credibility on these inconsistent statements during cross-examination results in prejudice to Fowler." Therefore, Fowler does not dispute the fact Peterson had a copy of the deposition, and thus, he does not satisfy the first prong of the *Ashker* test. As such, the claim fails and the trial court's contrary determination is reversed.

[¶ 13.] *2. Jane's videotaped statement*

■ [¶ 14.] On May 4, 1994, Jane gave a videotaped interview to the military's Office of Special Investigation. Immediately after the interview, Jane prepared and signed, a typed statement reiterating what she had just said on videotape. Shortly thereafter, Ensley received a copy of the videotape and typed statement. He testified he sent a copy of the typed statement to the prosecutor but was unsure whether the videotape had been sent as well. Fowler's counsel at trial had Jane's typed statement, but not the videotape. After the habeas corpus hearing, the court held that the prosecutor's failure to provide Fowler with the videotape violated his due process right to a fair trial. The habeas court summarily concluded "[t]he videotape allows the viewer to see . . . as she gave her statement and the prompting and questioning that proceeded her answers."

[¶ 15.] State argues the suppression of the videotape does not meet the *Ashker* test. In applying the *Ashker* four-part test, it appears questions one and four can be answered in the affirmative. The record indicates Fowler's request for evidence did include the videotape. It is also clear

---

4. It appears from the record that Peterson received his copy of Jane's civil deposition from the lawyers handling her civil case. The record does not indicate the state prosecutor ever had a copy of the deposition.

that Fowler was unaware of the videotape before or during trial.[5] Fowler first became aware of the videotape's existence because of a deposition taken of Ensley July 3, 1995, four months after the sentence was imposed in this case. *Fowler I,* 1996 SD 78, ¶ 25, 552 N.W.2d at 97. State claims in its brief "it is not clear, from the record, that the prosecutor was ever in possession of the videotape." However, Ensley was in possession of the videotape. We cannot try to determine after the fact why this tape was not given to Fowler's trial counsel. We do not condone this type of conduct by the prosecutor if he was in possession of the videotape as it could constitute a violation of the trial court's discovery order. *Id.* ¶ 27 n.2, 552 N.W.2d at 97 n2.

[¶ 16.] However, after a review of the videotape, which contained the same substantive content as the typed statement, we do not see how it could have created a reasonable doubt in the minds of the jurors that did not otherwise exist as a result of the typed statement. Evidence is favorable where it creates a reasonable doubt that did not otherwise exist. *Id.* ¶ 22, 552 N.W.2d at 96. While it is true the advantage of the videotape allows the viewer to see her as she answered questions, Jane's statement on the tape is substantively the same as her typed statement. Despite what the habeas court found, after our de novo review of the videotape, we do not see any improper "prompting" of Jane by the interviewer. At the commencement of the interview, it is obvious the interviewer knew little of the incident. As such, he could hardly have prompted Jane through the interview. Jane's answers were forthright, specific and detailed. She maintained a calm composure while giving responsive answers to the interviewer's questions.

[¶ 17.] Moreover, the jurors were able to observe Jane respond to questions on the witness stand during the trial and judge her credibility at that time. Therefore, the videotape adds nothing material to the case. We do not find a "reasonable possibility" that the videotape would have caused the jury to reach a different verdict.

[¶ 18.] *3. Sally's statements to police chief Ensley*

[¶ 19.] As in *Fowler II,* part of the allegedly suppressed evidence in the present case involves a pair of statements Sally had given to Ensley in May 1994. 1996 SD 79, ¶ 21, 552 N.W.2d at 395. On May 4, 1994, three years after she was attacked by Fowler, Sally met with Ensley as he was the new chief of police and he was "doing an in-depth investigation into the activities of Randy Fowler." Sally told Ensley what had happened between Fowler and her on July 7, 1991. Again, a week later, on May 11, 1994, Sally had a second conversation with Ensley to review what she had previously told him. A two-day jury trial was held in June 1995. Approximately two months later, on August 8 and August 14, 1995, the two May conversations were transcribed.[6]

[¶ 20.] State claims on appeal the failure to turn these two statements over to the defense is not a violation of Fowler's due process rights. Fowler argues these statements demonstrate Sally changed her recollection of what occurred in the North Sioux City police station on July 7, 1991. Fowler claims these statements provide the defense with "significant cross-examination fodder, for both [Sally] and Ensley,"

5. However, State does argue in its appellate brief that "because the defense was in possession of the typed statement – which was substantively identical to the videotape – the defense was 'aware' of the substance contained in the videotape. Thus, the defense was unaware of the existence of the videotape but was aware of its contents."

6. The audio tapes of the conversations are not in the record. Ensley testified at the habeas hearing that he could not recall when the tapes were given to the State, if at all.

and that the jury should have seen these statements when deciding credibility. Fowler claims this evidence would have been both favorable and material to his defense.

[¶ 21.] The habeas court, after a review of the transcripts of the conversations, found "[t]he transcripts of the conversations between ... [Sally] and Ensley show a friendly relationship between them and imply a sort of 'coercion' or at least strong encouragement by Ensley to convince a reluctant ... [Sally] to bring charges."

[¶ 22.] State argues as the transcripts of the conversations did not exist until two months after the trial, Fowler's request for evidence did not cover the transcribed statements. In contrast, Fowler essentially argues the prosecutor in this case had an affirmative duty to transcribe and turn over the two transcripts. Fowler cites to *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) to support his argument, and claims *Kyles* "did away with any distinction between types of defense requests, which evaporates State's argument." While *Kyles* imposes an affirmative duty on a prosecutor to disclose evidence to a defendant, the evidence must be "favorable" to the defense. 514 U.S. at 432, 115 S.Ct. at 1565, 131 L.Ed.2d at 505 (noting it is "clear that a defendant's failure to request *favorable* evidence did not leave the Government free of all obligation.").[7] (emphasis added). Regardless of a specific, general, or no request at all, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* The Court in *Kyles* also stated "the

constitutional duty is triggered by the potential impact of *favorable* but undisclosed evidence...." *Id.* Utilizing this analysis, we can not see how the content of these transcripts, which are substantially identical to Sally's testimony at trial, could have been favorable to Fowler, or could have created a reasonable doubt that did not otherwise exist among the jurors in this case.

[¶ 23.] For the same reason, the transcripts are not material to Fowler's defense. We find the habeas court erred when it found the State violated Fowler's due process rights by suppressing these transcribed statements. The only substantive evidence the habeas court identified as dissimilar from trial testimony was Sally's statements concerning whether she was intoxicated on the night in question. Sally testified at trial she did not feel like she was intoxicated at the time, but told Ensley on May 4, 1995 she had been drunk. In examining the two transcripts, the habeas court also found the second victim had to be "encouraged" to testify. After a de novo review of the transcripts, we do not find Sally was "coerced" in any way to testify at the trial. During the conversations Ensley talked to Sally about testifying at the trial and explained: "I do not at any cost want you to make up anything whatsoever," "I want you to tell absolutely as close to the truth as you can," and "... you only say what you remember or what you know." During these conversations with Ensley, Sally recounted in detail what Fowler had done to her at the police station. With all the evidence before the jury, we do not see how an inconsistent statement concerning whether or not Sally was intoxicated on

---

7. We note that the state's attorney who prosecuted this case testified at the habeas hearing he had not seen or did not recall seeing the two transcripts. Thus, it is unclear whether the prosecutor even had this evidence to suppress. However, *Kyles* appears to place an affirmative duty on a prosecutor to obtain any favorable evidence from any agent acting on its behalf: "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. at 437, 115 S.Ct. at 1567, 131 L.Ed.2d at 508.

the night in question would have produced a reasonable doubt.[8]

[¶ 24.] We have previously stated we must be convinced, from a review of the entire record that had the suppressed evidence been made available, the jury probably would have reached a different verdict. *Fowler II*, 1996 SD 79, ¶ 24, 552 N.W.2d at 395 (citing *Ashker*, 457 N.W.2d at 478). We are unable to reach such a conviction after a review of this record. Therefore, we reverse.

[¶ 25.] MILLER, Chief Justice, and SABERS, AMUNDSON and KONENKAMP, Justices, concur.

---

**8.** There is substantial corroborating evidence in *Fowler II*. Police officer Greg Hansen testified at trial he had walked in on Fowler and Sally about the time of Fowler's attack. Hansen asked Sally if she was okay and asked Fowler what was going on. Hansen testified Sally was visibly upset and had been crying, and fled for her vehicle parked outside. Hansen followed her outside to inquire again if she was "okay." Sally stated to Hansen, "[T]hank God you showed up when you did." Hansen did not make any statements at trial that Sally appeared intoxicated to him at that time. About a week after the incident Sally contacted Hansen about what had happened that night. Sally told Hansen that Fowler had told her she could either go to bed with him or be arrested. Hansen asked Sally if she wanted to make a formal statement and she agreed to do so.